BANK OF TARBORO v. FIDELITY AND DEPOSIT CO.

(Filed May 28, 1901.)

1. EVIDENCE—*Fidelity and Guaranty Insurance—Bond—Principal and Surety—Surety Companies.*

In an action by a bank upon the bond of its cashier, a memorandum of the examination of the cashier before the directors prior to the suit, is competent evidence.

2. PRINCIPAL AND SURETY—*Bond—Surety Company—Fidelity and Guaranty Insurance—Acts 1899, Chap. 30, Sec. 5.*

Under Acts 1899, Chap 30, Sec. 5, a surety company can be released from its liability on a bond only by getting off the bond.

3 FIDELITY AND GUARANTY INSURANCE—*Bond—Construction —Principal and Surety—Surety Company.*

A surety bond should be construed most strongly against the company and most favorably to its general intent and essential purpose.

4. FIDELITY AND GUARANTY INSURANCE—*Bond—Breach— Notice—Principal and Surety—Cashier.*

Where the plaintiff, in action on a surety bond, within a reasonable time and with due diligence, under the circumstances, gives notice of the default of its cashier, it is a sufficient compliance with the requirement of immediate notice.

5. FIDELITY AND GUARANTY INSURANCE—*Bond—Breach— Notice—Principal and Surety—Cashier.*

Where a surety company on bond of cashier is not notified immediately of default of the cashier, it does not suffer by the delay.

6. FIDELITY AND GUARANTY INSURANCE—*Insurance—Bond— Breach—Principal and Surety—Cashier—Instructions.*

In an action on surety bond, an instruction that the care and supervision required of officers of a bank was such as ordinarily prudent men would give, was correct.

ACTION by the Bank of Tarboro against the Fidelity and Deposit Company, of Maryland, heard by Judge *A. L. Coble* and a jury at Fall Term, 1900, of the Superior Court of EDGECOMBE County. From a judgment for the plaintiff, the defendant appealed.

*H. G. Connor & Son,* and *G. M. T. Fountain,* for the plaintiff.

*John L. Bridgers,* for the defendant.

DOUGLAS, J. This case has been here before, and is reported in 126 N. C., 320. As far as that decision goes, it will be considered as final in the determination of this case.

The following are the issues as submitted and answered:

"1. Did Mehegan, as cashier and while in the performance of the duties of his office, between December 15, 1895, and September 3, 1897, fraudulently take from the assets and money of plaintiff bank the sum of $5,000.00, and on May 27, 1897, for the purpose of concealing his fraudulent conduct, charge said amount to the City National Bank of Norfolk on the books of the plaintiff bank?

"Ans. Yes.

"2. Did the defendant Mehegan, between December 15, 1896, and September 3, 1897, as cashier, fraudulently take from the assets of the plaintiff bank a sum of money by means of overdraft on said bank aggregating $1,000.00, and more?

"Ans. Yes.

"3. Did the defendant Mehegan, between December 15, 1895, and September 3, 1897, as cashier, fraudulently take from the assets and money of said bank the sum of $9,550.00, or other amount, and by false entries on the books of said bank conceal the same from the plaintiff bank?

"Ans. Yes.

"4. Did the defendant Mehegan, as cashier, between May 12, 1897, and August 6, 1897, fraudulently take from the

money and assets of said bank the sum of $5,000.00, which he concealed by making false entries in the books of said bank?

"Ans. Yes.

"5. Did the defendant Mehegan, between December 15, 1895, and September 3, 1897, as cashier, fraudulently take money and assets of the bank and convert the same to his own use?

"Ans. Yes.

"6. Did the defendant, from September, 1896, to September 1, 1897, as cashier, fraudulently take from the money and assets of the said bank the sum of $452.21, which he applied to his own use?

"Ans. Yes.

"7. Did the defendant Mehegan, as cashier, on the 3d August, 1897, fraudulently issue a cashier's check on the said bank to J. M. Norfleet to the amount of $600.00 for the purpose of paying an individual indebtedness of said Mehegan?

"Ans. Yes.

"8. Did the defendant Mehegan fraudulently discount notes and bills, and pay for the same with money of the bank without the knowledge and assent of the proper committees?

"Ans. Yes.

"9. Did the plaintiff notify the defendant Fidelity and Deposit Company of the alleged default of the said J. G. Mehegan as required by the bond?

"Ans. Yes.

"10. Did the plaintiff, after the execution of the surety contract, increase its capital stock?

"Ans. Yes. (This was answered by the jury, Yes, in April, 1896.)

"11. Were the representations in the certificate for the renewal of the surety bond as to the dealings and accounts of the said Mehegan, cashier, true and correct when they were made?

"Ans. Yes.

"12. Were such representations as to the dealings and accounts of the said Mehegan, cashier, on the said certificate false, to the knowledge of the plaintiff, at the time they were made?

"Ans. Yes.

"13. Did said representations constitute a material inducement of the defendant company to continue said bond from December 15, 1896, to December 15, 1897?

"Ans. Yes.

"14. Did the plaintiff cause to be observed due and customary supervision over said Mehegan, cashier, for prevention of default?

"Ans. Yes.

"15. Did the Fidelity and Deposit Company have notice of the increase of the capital stock before the extension of the bond?

"Ans. Yes."

The defendant assigns for error: "1. That the Court erred in admitting the written statement as excepted to. 2. For error in instructing the jury as set out in the charge to the jury. 3. In that the instructions are inconsistent, contradictory and misleading. 4. In the construction of the meaning of the words 'immediately notified.' 5. In instructing the jury that the same supervision and duty required of the officers of the plaintiff bank, over the management of the affairs of the bank, was such care, supervision and duty as the ordinarily prudent business man would give. 6. For refusing to instruct the jury as requested in the several prayers submitted by the defendant."

The first assignment of error can not be sustained. The admitted paper was a memorandum of the examination of the defendant Mehegan before a committee of the Board of Directors of the plaintiff bank, and taken down by the witness

128——24

Davis, who testified as follows: "Mehegan was present before the committee; he was examined; his examination was put in writing. I read every sentence to Mehegan, as Mr. Fountain propounded the questions; *then I wrote down Mehegan's answer.* I read the questions and answers as they were made, and he said that they were correct. *The entire paper is in my handwriting.* Then read the whole over to Mehegan. He never refused to sign, never was asked to sign it." Under such circumstances, we think the paper was admissible as part of the testimony of Davis, with whose credibility, of course, its own was involved. *Bryan v. Moring,* 94 N. C., 687; *State v. Pierce,* 91 N. C., 606; *State v. Jordan,* 110 N. C., 491, 495.

We do not think that either the second or third assignments can be sustained. The Judge's charge extends through 15 pages of the printed record, and is full, clear and explicit, and, we think, free from substantial error. Many of the points raised by the defendant come under the principles decided when the case was first before us. We then said (126 N. C., 344): "The object of the contract was to secure the plaintiff against the fraudulent acts of its cashier. The complaint alleges the execution of the bond and its renewal, and sets out their substantial features, the alleged fraudulent acts of the cashier, and notice to the defendant company. These facts being proved would have made out the plaintiff's case. Nothing else appearing, the plaintiff would have been entitled to recover, and if the defendant company relied upon breaches of the contract on the part of the plaintiff to defeat a recovery, it should have specifically pleaded them. The burden of proving them would have rested upon the defendant. To require the plaintiff to set out each and all of the fifty conditions and stipulations in the bond and application, and then prove affirmatively that he had performed each one of them, would practically defeat any recovery, and would amount to a denial of justice."

That this is now the law of this case, and our opinion of its correctness has been confirmed by subsequent investigation and further reflection.    The object of an indemnifying bond is to indemnify; and if it fails to do this, either directly or indirectly, it fails to accomplish its primary purpose, and becomes worse than useless.    It is worthless as an actual security, and misleading as a pretended one.

The defendant lays great stress upon section 5, chapter 300, Laws 1893, which is as follows: "Any company executing such bond, obligation or undertaking may be released from its liability as surety on the same terms as are or may be by law prescribed for the release of individuals upon any such bond, obligation or undertaking."    It seems clear to us that the only object of that section was to enable such company to release its liability by *getting off* the bond whenever an individual could do so; but not to remain on the bond and limit its liability by such unreasonable restrictions as would practically amount to a release by tending to defeat a recovery. Moreover, that section says: "On the same terms as are or may be by law prescribed."    Where are any such terms prescribed by law as those which appear in the bond before us, and which the defendant is so strenuously endeavoring to bring within the terms of that section?    We are sure that act never intended to authorize trustees, guardians or administrators to give bond with such stipulations, construed as the defendant is now asking us to construe them.    The defendant again insists that it should have the same right to limit its liability as is possessed by an individual.    That may be; but no member of this Court has ever seen or heard of a bond in such a form being tendered by a private surety.    In its very form and essence, the bond before us resembles an insurance contract, and differs materially from the ordinary forms coming down to us by immemorial usage.    Therefore, we must place such bonds in the general class of insurance poli-

cies, and construe them upon the same general principles; that is, most strongly against the company, and most favorably to their general intent and essential purpose. *Bank v. Fidelity Co.*, 126 N. C., 320, 325; *Am. Surety Co. v. Panly* (No. 1), 170 U. S., 133. In the latter case, Justice *Harlan*, speaking for a unanimous Court, says on page 144: "If, looking at all its provisions, the bond is fairly and reasonably susceptible of two constructions, one favorable to the bank and the other favorable to the surety company, the former, if consistent with the objects for which the bond was given, must be adopted, and this for the reason that the instrument which the Court is invited to interpret was drawn by the attorneys, officers, or agents of the surety company. This is a well-established rule in the law of insurance. *National Bank v. Insurance Co.*, 95 U. S., 673; *Western Insurance Co. v. Cropper*, 32 Pa. St., 351, 355; *Reynolds v. Insurance Co.*, 47 N. Y., 597, 604; *Insurance Co. v. McConkey*, 127 U. S., 661, 666; *Fowkes v. Manchester*, etc.; *Asso.*, 3 Best & Smith, 917, 925. As said by Lord St. Leonards, in *Anderson v. Fitzgerald*, 4 H. L. Cases, 484, 507, 'It (a life policy) is, of course, prepared by the company, and if, therefore, there should be any ambiguity in it, must be taken, according to law, most strongly against the person who prepared it.' There is no sound reason why this rule should not be applied in the present case. The object of the bond in suit was to indemnify or insure the bank against loss arising from any act of fraud or dishonesty on the part of O'Brien in connection with his duties as cashier, or with the duties to which in the employer's service he might be subsequently appointed. That object should not be defeated by any narrow interpretation of its provisions, nor by adopting a construction favorable to the company if there be another construction equally admissible under the terms of the instrument executed for the protection of the bank." To the same effect are the cases of *Fire Insurance Co. v. Coos Co.*, 151 U. S., 452; *London Asso. v. Campa-*

*nia de Moagans do Bareiro,* 167 U. S., 149; *Horton v. Insurance Co.,* 122 N. C., 498; *Grabbs v. Insurance Co.,* 125 N. C., 389, 398, and cases therein cited. The same principle of construction has been applied to the contracts of common carriers. *Wood v. Railway Co.,* 118 N. C., 1056, 1063; *Mitchell v. Railway Co.,* 124 N. C., 236; *Jeffreys v. Railway Co.,* 127 N. C., 377; *Hinkle v. Railway Co.,* 126 N. C., 932.

The defendant has voluntarily become by virtue of the statute what may be called a "common surety," not exactly in the nature of a common carrier like railroad and telegraph companies, but still one of those public agencies to which are given unusual powers and which have assumed the most sacred responsibilities. Permitted by law to act as sole sureties for trustees, guardians, administrators and other fiduciaries, they are held by the policy of the law to the full measure of the responsibility they have voluntarily assumed. They may make such reasonable regulations as are necessary for their own protection or the proper transaction of their business; but such stipulations will be most strongly construed against a forfeiture of the indemnity for which alone the bond is given, and in favor of a fair and equitable construction of the essential purposes of the contract.

The fourth exception is equally untenable. On that point his Honor charged as follows: "If you find from the testimony that the plaintiff bank, in a reasonable time and with due diligence under the circumstances as explained in these instructions, and in view of all the facts in evidence, gave notice of the default of the said Mehegan, you should answer the 9th issue 'Yes.' The plaintiff was not required by the terms of the bond to give notice to defendant company upon suspicion that Mehegan was guilty of fraudulent conduct. The plaintiff was not required to give notice to the defendant company until it had actual knowledge of such facts as would justify the charge of default, and it was entitled to a reasonable time to investigate the condition of said Mehegan's ac-

counts before it was required to give such notice, if such investigation was necessary to ascertain the facts which would justify the charge of fraud."

In this we see no error. The plaintiff was not required to act upon mere suspicion in preferring so grave a charge as fraud or embezzlement. Moreover, reasoning from analogy to the rights of a guarantor, the defendant does not appear to have suffered any material injury from such delay, even if the plaintiff had been responsible for the delay, which the jury found to the contrary. But the defendant contends "that if the surety is 'immediately notified' of the defalcation, upon its discovery, the surety would have an opportunity to deal with the defaulter, and secure some part, if not all, of its loss; this case proves at once the wisdom and justice of such a provision, for by not notifying the surety 'immediately,' *the plaintiff was enabled to get all the security the defaulting principal, the cashier, could give, and the surety had no opportunity.*" The plaintiff had the right to resort to all the property of the defaulting cashier, whether he gave bond or not; and if the defendant means to contend that by signing the cashier's bond as surety it acquired a right of reimbursement superior to that of the bank, we can only say that it does not so appear to us either from the terms of the bond or the general principles of law.

The fifth assignment of error can not be sustained, as we think the charge of his Honor was correct. In fact no other rule justly capable of practical application suggests itself to us.

The sixth exception is equally untenable. The defendant submitted twelve special instructions, occupying five pages of the printed record. It is useless as well as impracticable to consider each in detail. All we need now say, in addition to what has already been said, is that they were all properly refused, either for intrinsic error or because sufficiently given

in his Honor's charge. In the absence of substantial error the judgment of the Court below is

Affirmed.