In re MUNFORD.

(District Court, E. D. North Carolina.   January 7, 1919.)

1. BANKRUPTCY ⚌143(8)—PROPERTY VESTING IN TRUSTEE—DOWER RIGHTS OF WIFE.

   Where, under the state law, the wife of a bankrupt has an inchoate dower right in his equitable estates, and has joined with him in mortgages under which his realty is sold subsequent to bankruptcy, she has a dower right only in the surplus proceeds, and is not, as against the trustee, representing the unsecured creditors, entitled to the present value of one-third of the entire proceeds of the sale.

2. BANKRUPTCY ⚌353—DOWER INTEREST OF WIFE.

   Where the bankrupt's wife had an inchoate dower interest for life in the surplus proceeds of his lands sold under foreclosure, one-third of such surplus was directed to be invested in government bonds, to be held by the clerk after settlement of the estate.

3. BANKRUPTCY ⚌482(3)—ADMINISTRATION OF ESTATE—ALLOWANCE OF ATTORNEY'S FEES.

   Under Bankruptcy Act 1898, § 64b (3), being Comp. St. § 9648, requiring the court to allow as costs of administration "one reasonable attorney's fee for professional services actually rendered * * * to the petitioning creditors in involuntary cases," such allowance must be confined to payment for service actually rendered in filing the petition and prosecuting it to an adjudication.

4. BANKRUPTCY ⚌482(3)—ADMINISTRATION OF ESTATE—ALLOWANCE OF ATTORNEY'S FEES—"DUTIES HEREIN PRESCRIBED."

   Under Bankruptcy Act 1898, § 64b (3), being Comp. St. 1916, § 9648, authorizing the allowance of a reasonable attorney's fee for services actually rendered to the bankrupt "while performing the duties herein prescribed," such duties are those required of the bankrupt for the benefit of the estate.

5. BANKRUPTCY ⚌4—PURPOSE OF ACT.

   The purpose of the Bankruptcy Act is (1) to apply the property of an insolvent person or corporation to the payment of the debts with as little expense and delay as is consistent with their interests; (2) to relieve the honest and unfortunate debtor from his debts, and give him another opportunity in the industrial life of the community.

In Bankruptcy.   In the matter of C. T. Munford, bankrupt.   On exceptions to report of special master respecting allowance of dower to Mrs. J. Caroline Munford and allowance to attorneys.   Exceptions sustained in part.

Harry Skinner, of Greenville, N. C., for petitioner.

S. J. Everett and Julius Brown, both of Greenville, N. C., for creditors.

F. G. James & Son and F. C. Harding, all of Greenville, N. C., for trustees.

CONNOR, District Judge.   C. T. Munford was, on the 22d day of September, 1916, adjudged bankrupt.   A number of controverted questions having arisen in the course of the administration of the estate, an order of reference was made, appointing F. H. Bryan, Esq., special master, with direction to hear and report the evidence in regard thereto, together with his findings of fact and conclusions of law.

---

⚌For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

It appears from his report that, prior to his adjudication, the bankrupt was the owner of several large and valuable tracts of land and town lots, upon which he, together with his wife, Mrs. J. Caroline Munford, had executed mortgages to secure the payment of debts, for which his wife was not personally liable. Subsequent to the adjudication, the several mortgages, pursuant to the power conferred upon them, sold the real estate for sums aggregating $83,740.10. After discharging the debts secured by the mortgages, with the expense incurred in making sales, the excess of $10,389.79 was paid to the trustees in bankruptcy, and is held by them for distribution among the unsecured creditors, subject to the dower right of Mrs. Munford, which she asserts in this proceeding.

The master reports that, on the day of the sale, C. T. Munford, was 55 years of age, and his expectancy, ascertained by reference to the mortuary table (Rev. 1905, § 1626), is 17.4 years. Mrs. Munford was, on the same day, 48 years of age, and her expectancy is 22.4 years, being 5 years in excess of the expectancy of her husband. The master finds the value of her dower interest to be $3,613.26, one-third of the amount derived from the sale of the real estate, after paying the mortgage indebtedness. He ascertains the present value of this amount to be $912.23. This result is reached by calculating that she will survive her husband 5 years, and adopting the expiration of his expectancy as the date upon which her right to dower will become consummate.

To this conclusion Mrs. Munford excepts and insists:

(1) That she is, as against the trustees, representing the unsecured creditors, entitled to the present value of one-third of the entire proceeds of the sale of the real estate.

(2) That, in ascertaining the present value of this sum, she is entitled to have her expectancy placed at 11 years—that being the period fixed by the tables for a person who has reached 65 years, her age at the date of the anticipated death of her husband.

[1] The rights of Mrs. Munford are dependent upon, and fixed by, the law of North Carolina. They are not controlled, or affected by, the provisions of the Bankrupt Law. Revisal 1905, c. 78, § 3083 (Acts 1868–69, c. 93, § 32), provides that—

"Widows shall be endowed as at common law, as in this chapter defined."

Section 3084 provides that, upon the death of her husband intestate, every married woman shall be entitled to an estate for her life in one-third in value of all the lands whereof her husband was seized and possessed at any time during coverture. The statute provides the procedure for the allotment of dower upon the death of the husband. Prior to 1868, a widow was endowed only of lands of which the husband died seized and possessed. In Thompson v. Thompson, 46 N. C. 430, it was held that the widow of a mortgagor deceased was entitled to dower in the equity of redemption, or other equitable estate, owned by her husband. It was held in Caroon v. Cooper, 63 N. C. 386, that upon the death of the husband, possessed of an equity of redemption, the widow was entitled to have the two-thirds of the

mortgaged land sold in exoneration of her dower. Ruffin v. Cox, 71 N. C. 253; Overton v. Hinton, 123 N. C. 1, 31 S. E. 285.

In Gwathmey v. Pearce, 74 N. C. 398, the wife having joined her husband in the execution of a mortgage upon land in which, under the act of 1868, she had an inchoate right of dower, which was sold under the power contained in the mortgage, she was permitted to prove, as a debt against the estate of her husband, and share in the general assets, the value of her dower—one-third the value of the mortgaged lands. The court regarded her right as the same as if she had mortgaged, for the security of her husband's debt, her separate real estate, making her, to the extent of the value of her dower, a surety of the husband. In that case the court treated the entire one-third of the price for which the land was sold under the mortgage as the measure of the value of her dower. The question as to the "present value" was not raised or referred to.

In Gore v. Townsend, 105 N. C. 228, 11 S. E. 160, 8 L. R. A. 443, it is held that the wife, who has joined her husband in the execution of a mortgage, was entitled, in exoneration of her dower, to have the personal estate of her husband applied to mortgage debt. In Southern Loan & Trust Co. v. Benbow, 135 N. C. 303, 47 S. E. 435, it is held that the inchoate right to dower, while not an estate in her husband's land which can be assigned or conveyed by the wife, is a valuable right; that its release, by way of mortgage, to secure her husband's debt, constitutes a valuable consideration, and will sustain a promise on his part to pay the value thereof. 10 A. & E. Enc. 143. It is held in this state that, until the death of her husband and the allotment of dower, the widow has no present estate or title to any part of her husband's lands. Fishel v. Browning, 145 N. C. 71, 58 S. E. 759.

Reference to the text-books does not aid in fixing the character of the wife's inchoate right to dower in her husband's lands. Scribner says:

"It is difficult to state with precision the nature or qualities of inchoate dower interest, when considered as a part of the husband's property. A certain vagueness of expression uniformly characterizes the discussions on the subject, and these discussions are commonly attended with unsatisfactory results. * * * Although, therefore, an inchoate right of dower cannot be properly denominated an estate in lands, nor a vested interest therein, and notwithstanding the difficulty of defining with accuracy the precise legal qualities of the interest, it may, nevertheless, be fairly deduced from the authorities that it is a substantial right, possessing, in contemplation of law, the attributes of property and to be estimated and valued as such." Dower, 5.

Mrs. Munford would have been entitled, for the protection of her inchoate right of dower, released by joining her husband in the execution of the mortgages, to redeem the land, and as against the heir and creditors of her husband the excess sold in exoneration of her dower. 10 A. & E. Enc. 166. She would have been entitled to a decree in a court of equity directing the sale of the several tracts of land in such manner as to exonerate her dower, but it is apparent that she would have derived no benefit from doing so. The several tracts were mortgaged to amounts approximating their full value. She therefore sustained no injury by permitting the mortgagees to sell free of

her dower right. It would seem that, upon the authority of Gwathmey v. Pearce, supra, she may have waived her claim to dower in the proceeds, and proven as a creditor her claim for the value of her inchoate dower right in the land. She would, however, encounter practical difficulty in ascertaining to what amount she would have been entitled.

Having elected to claim her dower in the proceeds, the question arises: What is the extent of her right and its present value?

She contends that, as against the trustees, she is entitled to the present worth of one-third of the entire proceeds of the land. The question presented by this contention has not been decided by the Supreme Court of this state. Reference to text-books and decisions of other courts, in which the wife is entitled to dower in the equitable estates of the husband, does not sustain her contention.

In 2 Jones on Mortgages, 1693, it is said:

"A widow, who has joined her husband in a mortgage of land of which he is seized, is in equity entitled to dower in the surplus money, arising from a foreclosure sale of the property, after satisfying the mortgage debt. To the extent of the debt secured by the mortgage, in which she released, her dower interest is extinguished, and she is dowable only in the surplus. The surplus stands in the place of the equity of redemption, and retains all the properties of realty, and does not become personalty for the purpose of distribution among the next of kin." Scribner, Dower, 697; Hall's Adm'r v. White, 114 Va. 562, 77 S. E. 474; Titus v. Neilson, 5 Johns. Ch. (N. Y.) 452; Denton v. Nanny, 8 Barb. (N. Y.) 618; Vartie v. Underwood, 18 Barb. (N. Y.) 562; Keith v. Trapier, Bailey Eq. (S. C.) (750) 63.

This is the general rule. 10 A. & E. Enc. 169.

[2] The next, and most difficult, question for solution is the method of securing the right to the wife, pending the life of her husband. Prior to the adoption of mortuary tables, which the courts accept as evidence upon which the expectancy of a person entitled to an estate for life in money may be ascertained, much doubt was expressed whether there was any basis upon which the present value of such interests could be ascertained. In Titus v. Neilson, 5 Johns. Ch. (N. Y.) 452, Chancellor Kent directed that one-third of the surplus proceeds from the sale of lands mortgaged by the husband and wife jointly, sold after his death, be invested in government stocks and the interest paid to the widow during her life. In Denton v. Nanny, supra, the Chancellor says:

"The widow does not ask to have this money put into her immediate possession. She would have no right to that. But she insists that the residuum of the subject mortgaged, not required to satisfy the mortgage debt, whether it exists in lands unsold, or in the proceeds of lands sold, * * * shall be so appropriated as to secure her dower, should she survive her husband. This, I think, she is entitled to have done."

The same course was pursued in Vartie v. Underwood, supra.

In Herbert v. Wren, 7 Cranch, 370, 3 L. Ed. 374, Judge Marshall directed that the fund representing the dower interest, the husband being dead, be invested and the interest paid to her during her life, unless both parties consented to the payment of a sum in gross in lieu of dower. It is held by some courts that, unless all parties in

interest consent, the present worth of the dower interest in funds derived from sale of the lands, in which she is entitled to dower, will not be paid to the widow. This appears to be the rule in Virginia. 10 Am. & Eng. Enc. 181 (note).

In several states statutes have been enacted empowering the court to ascertain the present value and pay it to the widow. Such statutes apply only when the husband is dead and the widow's dower right has vested. As said by Ruffin, C. J., in Atkins v. Kron, 43 N. C. 1, and other chancellors, it is difficult to adopt a satisfactory basis upon which to fix the expectancy of the widow and ascertain the present value of her dower. The mortuary tables are only evidence to be considered with other evidence relevant to the question. When, as in this case, the husband is living, with an expectancy of 17 years, the problem is burdened with uncertainty. There are so many contingencies involved that any result is speculative.

It is doubtful whether courts, under such conditions, should, without the assent of all persons interested, dispose of property rights. The legal statutory right of the parties is fixed, easily protected and enforced. The investment of the fund and payment of interest to the husband, or the assignee of his interest, until the dower right vests, secures to the widow her dower right, which may be enjoyed by receipt of the interest during her life, with the payment of the corpus, representing the reversion, to the heir or his representative. Is it not more in accord with that certainty, which is "the mother of quietness and repose," and the beneficent policy of the law which seeks to protect and secure an income to the widow when deprived of the support of her husband, to hold the fund for that purpose, than, by resorting to a speculation based upon a speculation, give her, 17 years before his death, a sum arrived at by a mere guess? As illustrative of the difficulty experienced in reaching a reasonably satisfactory basis for fixing the present value of Mrs. Munford's dower right, she, with much force, insists that, if she shall, as the court is asked to assume, survive her husband, she will, at his death, be 65 years of age, with an expectancy of 11 years.

In Brown v. Brown, 94 S. C. 492, 78 S. E. 447, the court approved the rule laid down by Chancellor Walworth in Jackson v. Edwards, 7 Paige (N. Y.) 386, which was followed by the special master for ascertaining the present value of the dower when the husband was living. The court in that case dealt with the question only incidentally. It was not the point in controversy.

In the absence of a statute empowering the court to ascertain and pay to Mrs. Munford what may, by speculation, be supposed to be the present value of her dower right, or the consent of all parties in interest to the payment of the amount fixed by the special master, a decree will be signed directing the trustees to invest one-third of the surplus of the proceeds of the sale of the lands mortgaged, in United States Liberty Bonds, and upon final settlement of the estate deliver them to the clerk of this court at Raleigh, to be held for the purposes indicated herein. A decree will then be signed, protecting the interest of the parties. As the trustees do not except to the find-

ings of the special master, if Mrs. Munford shall elect to accept in lieu of her dower the amount, $912.73, found to be its present value, a decree may be drawn confirming the report in that respect.

The exceptions to allowance to attorneys will be disposed of separately.

[3] 1. The master recommends that an allowance of $1,250 be made to the attorneys for the petitioning creditors. The creditors insist that this amount is excessive. The authority for allowing counsel fees to attorneys for petitioning creditors in involuntary cases in bankruptcy is found in section 64 (3) of the act (Act July 1, 1898, c. 541, 30 Stat. 563 [Comp. St. § 9648]). Collier on Bankruptcy (11th Ed.) 985. The allowance is confined to—

"one reasonable attorney's fee for the professional services actually rendered, irrespective of the number of attorneys employed, to the petitioning creditors."

To such allowance the petitioning creditors, or their attorneys, are entitled, as a matter of right. The sole question, open for the action of the court, relates to its amount. The amount must, of course, be reasonable, and be determined upon the evidence of the service performed and its value.

"The amount to be allowed rests in legal judgment and judicial discretion, but not in unrestrained discretion." In re Williams (D. C.) 240 Fed. 788.

In exercising legal or judicial discretion, the court should endeavor to ascertain the rule or principle by which other courts in like cases have been governed, taking into account such modifying conditions or circumstances as may be found in the instant case.

The principles upon which, in view of the language of the statute and the purpose of the Congress in its enactment, allowances to attorneys for petitioning creditors, in involuntary cases, should be made, was carefully considered by Judge Brawley, and his conclusions stated with his usual clearness, in Re Goldville Mfg. Co. (D. C.) 123 Fed. 579. In that case he dealt with almost every phase of the question relating to allowance of attorneys in involuntary proceedings in bankruptcy. The learned judge said:

"That discretion should be exercised to carry out and effectuate the legislative will, and the courts cannot honestly disregard the manifest policy of the law, which looks to great economy of administration. * * * That discretion must be in accordance with, and not in conflict with, the policy of the law."

It is uniformly held, and is in accordance with the plan provided by the act for dealing with such cases, that the allowance is to be confined to "services actually rendered" in filing the petition and prosecuting it to the adjudication of the bankrupt. When this is accomplished, the estate passes under the jurisdiction and control of the court and its officers; the interest of the petitioning creditors, usually a small minority in number and amount of the general creditors, is merged into that of all of the creditors. The purpose of the act, the seizure and administration of the property of the bankrupt for the benefit of all the creditors, is accomplished. There is neither necessity nor opportunity for the attorney of the petitioning creditors to

255 F.—8

render "actual service" to the estate. The suggestion, therefore, that the attorneys in this case "have been diligent and faithful for nearly two years, * * * and largely through their efforts the amount in the hands of the trustees is as large as it is," while true, cannot be taken into consideration in fixing the allowance.

In rendering service after the adjudication and election of the trustee, counsel were serving their clients, whose claims they held for collection. Other creditors had employed other counsel, and the estate is charged with counsel fees of an attorney for the trustees. I find that, of the 116 creditors who have proven debts, counsel for petitioning creditors represent 43 in number; the amount, however, is more than one-half of the whole. The bankrupt had, within four months of his adjudication, executed a deed of assignment of his stock of merchandise. This was the principal and sufficient act of bankruptcy upon which he was adjudged a bankrupt. He had, more than four months prior thereto, executed mortgages or deeds of trust on real estate. There was no complication in regard to either of these transactions. He admitted insolvency and offered a composition, to which the requisite number of his creditors did not assent, and it was not confirmed. The attorneys for petitioning creditors appeared before the court and objected to the confirmation. There was no litigation in connection with the proceeding.

It is true, as found by the special master, that the attorneys successfully resisted the acceptance of the offer of a 10 per cent. composition, and that the creditors will, in this proceeding, receive approximately 40 per cent. This should be taken into consideration in fixing the amount of the allowance. The lands were sold by the mortgagees or trustees to whom they were conveyed, and the debts, in regard to which there was no controversy, paid; the excess, constituting a large portion of the assets for distribution, paid to the trustees. The stock of goods was sold by the trustees. From these sources the bulk of the assets for distribution were derived. An examination of such cases as I find in the Federal Reporter brings me to the conclusion that an allowance of $750 to the attorneys will be ample. For such services as they shall have rendered in securing the enlargement of the volume of the assets for distribution, in which their clients share, they will, as they are entitled, receive compensation from them.

In fixing the allowance, I am not inadvertent to the zeal and skill displayed by counsel in the prosecution of this proceeding, nor to the personal and professional courage manifested; but much of this service relates to the administration of the estate, causing the stock of goods and the lands to bring more than they otherwise would have done. It is not included, either by the language or the general scope of the act, in services for which an allowance may be made to be paid by the trustees. In Re Harrison Mercantile Co. (D. C.) 95 Fed. 123, in response to a claim for such services, Philips, J., said:

"It is further claimed by these attorneys, as a basis of their compensation, that they induced several bidders to attend the sale of the property of the bankrupt. * * * Presumptively, and naturally enough, interested creditors in the estate would either attend in person, or be represented at such sale, to see that the property be not sacrificed, as they are the especial bene-

ficiaries in the product of the sale. No provision of the Bankruptcy Act even squints at an allowance against the estate for such service."

[4] 2. The next exception is directed to the allowance of $500 to the attorney of the bankrupt. The act, by section 64 (3), provides for the payment of—

"one reasonable attorney's fee to the bankrupt, in involuntary cases, while performing the duties herein prescribed, * * * as the court may allow."

What has been said in regard to the principle by which the court should be guided in the exercise of its legal discretion, in regard to allowances to attorneys for petitioning creditors, is equally applicable here. The further limitation is imposed that an allowance can be made only for such service as is rendered to the bankrupt "while performing the duties imposed upon him by the act." This excludes compensation for service rendered the bankrupt prior to filing the petition, resisting the adjudication, or in proposing or urging the acceptance or confirmation of a composition. The statute, by section 7, imposes the duty upon the bankrupt to attend the first meeting of the creditors and to file schedules of his debts and property. For necessary assistance in discharging these duties he is entitled to one reasonable counsel fee. In Re Mayer (D. C.) 101 Fed. 695, Seaman, Judge, says that the power to make the allowance is—

"limited in strict accord with the general tenor and spirit of the enactment, and neither express nor intend an allowance for the defense of the bankrupt through the course of the proceedings in matters involving his personal liability. * * * The duties to be performed by the bankrupt in the proceedings are prescribed in section 7, and all relate to attendance and service of presumptive benefit to the estate, with the possible exception of attending at 'the hearing upon his application for a discharge.' The preparation of schedules by the bankrupt in involuntary cases, and his attendance on compulsory examinations before the referee, are matters in discharge of his duty, for the benefit of the estate, and each may require the services of an attorney, for which the estate thus receiving the benefit is chargeable for reasonable compensation; but, in conformity with the purposes of the act, the allowance must be made 'sparingly and with great caution.' * * * The test for compensation out of the estate is whether the service is rendered in the performance of the bankrupt's duty in aid of the estate and its administration, and not whether the bankrupt stands in need of the service of counsel for his personal benefit and protection in any of the proceedings. No sanction appears in any of the provisions for an allowance in the last-mentioned view, and its adoption would violate the general consistency of the act for securing economy in administration."

The judge states that the allowance usually made in the district (E. D. Wisconsin) for service in drafting schedules is from $25 to $50, according to the extent—the work is mainly clerical.

In the Goldville Mfg. Co. Case, supra, the attorney for the bankrupt was allowed $200. I do not find that, in any case reported, an allowance of $500 to the attorney for the bankrupt has been made. No such allowance has been made in this district. The special master says, and in this I concur, that $500—

"would poorly compensate the attorney for the time, study, and attention that he has given the matter, and for the time that he has had to be away from his office attending to different phases as they arose."

He also calls—

"special attention to the schedules prepared by him. They are the neatest and most accurate that I have seen."

Conceding all of this, as is done, it is manifest that there was no duty imposed upon the bankrupt by the law or the orders of the court in the course of administration, requiring the aid or service of an attorney for which an allowance of $500 should be made. No charges of fraud or concealment of assets, or other improper conduct, have been made. No opposition was made to his discharge. The property scheduled consisted of tracts of land and town lots, a stock of goods, and a few choses in action of small value. The lands were sold by those who held mortgages, and the goods by the trustees. The adjudication was made without opposition. The only meeting had before the court was to hear the report of the referee upon the proposition for a composition; the only question presented was whether a majority in number and amount of the creditors had accepted. The schedules were not complicated or difficult of preparation, and, although skillfully and well done, required no study or large professional learning.

A number of complications, giving trouble to the trustees and creditors, arose in the course of administration, growing out of claims made by the bankrupt and his wife. Without criticizing the course pursued, it is apparent that much of the work imposed upon the trustees and the attorneys for creditors for the bankrupt and the trustees was caused by these complications. They pertained to the administration of the estate, did not involve or result in litigation, and cannot be considered in fixing the allowance to the attorney for the bankrupt. For services rendered the bankrupt and his wife, which were valuable, the attorney should be paid by them, and not the creditors. In view of the scale of allowances made for such services as were rendered, within the provisions of the act, in this and other districts, an allowance of $200 is made.

3. The next exception relates to the allowance of $500 as made to the attorney for the trustee. The authority for making this allowance is found in section 62, as of "the actual and necessary expenses incurred by officers in the administration of estates." The special master reports:

"For the multitude of papers that he has had to draw, and the sales and resales that he has had to attend, and the time and attention that he has had to give, this is a small allowance."

It appears that two tracts of land and three town lots scheduled by the bankrupt were under mortgage. They were sold for $83,740.10. Some of them were resold, upon advanced bids. Mrs. Munford had mortgaged her separate property for $10,000 to secure her husband's debt, and he executed to her for indemnity a second mortgage on a portion of his real estate. The crops on the farms were also mortgaged. These conditions, with other questions arising during the administration of the estate, required the services of a skilled attorney. It is conceded that the counsel retained by them, with the approval of the court, has rendered valuable and efficient service.

The estate has been wisely managed by the trustees, litigation avoided, and the interests of the creditors in all respects conserved and promoted. To March 12, 1918, the trustees had received $29,669.49 and paid out $10,659.52. Their report was submitted to the creditors and approved. I am of the opinion that, taking into consideration the conditions found by the special master, the allowance to the attorney for the trustees is just and reasonable. The report in that respect is confirmed.

An order will be signed directing the trustees to pay the attorneys for the petitioning creditors $750, the attorney for the bankrupt $200, and the attorney for the trustees $500. I concur with the special master in regard to the high character, business ability, and experience of the trustees, and their wise management of this estate. The statutory commissions, paid them jointly, of $466.-- 69, are totally inadequate compensation for the time consumed and responsibility imposed by their office; but, as said by the special master, they will find their compensation in the consciousness that they have discharged a difficult responsibility with intelligence and fidelity. The compensation to the special master was fixed by the parties. His report discloses careful consideration, intelligent comprehension, power of analysis, and clarity of expression.

[5] The purpose of the Bankruptcy Act is: (1) To apply the property of the insolvent person or corporation to the payment of the debts with as little expense and delay as is consistent with their interests. (2) To relieve the honest and unfortunate debtor from his debts and give him another opportunity in the industrial life of the community.